2008 BNH 008
_____

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re:                                                                    Bk. No. 07-11062-MWV
                                                                          Chapter 13
Richard R. Martin,
            Debtor


*Leonard G. Deming, II, Esq.*
*DEMING LAW OFFICE*
*Attorney for Richard R. Martin*

*Mark F. Weaver, Esq.*
*FORD & WEAVER, P.A.*
*Attorney for Beck's Custom Homes, Inc.*

**MEMORANDUM OPINION**

  Before the Court is Richard R. Martin's (the "Debtor") objection to the Proof of Claim filed by Beck's Custom Homes, Inc. (hereinafter "Beck's"), which is Claim No. 11 in the Debtor's bankruptcy case. Beck's Proof of Claim lists a secured claim in the amount of $414,000 (the "Claim"). The Claim represents payments Beck's made to Right-Way Builders, Inc. (hereinafter "Right-Way") in connection with a joint venture agreement between the two corporations. Beck's asserts the Claim against the Debtor personally under the theory of piercing the corporate veil. The Debtor objects to Beck's Proof of Claim on the basis that the Court should not pierce Right-Way's veil. On January 16 and January 17, 2008, the Court held evidentiary hearings on the matter and took it under submission.

**JURISDICTION**

  This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core

proceeding in accordance with section 157(b).[1]

## BACKGROUND

The Debtor is one of two shareholders of Right-Way, a family-owned New Hampshire corporation in the business of constructing residential homes. He serves as Right-Way's sole director and president. The Debtor's wife is the other shareholder and serves as the vice president. Right-Way was incorporated in 1997.

On August 12, 2004, Right-Way entered into a joint venture agreement with Beck's, a New Hampshire corporation also in the construction business. This agreement (the "Letter of Intent") memorialized the parties' plan to build fifty-six condexes on two parcels of land located in the Town of New Boston (the "Project"), and listed each party's obligations under the agreement. Right-Way owned one of the subject parcels of land (the "Beard Road Property"), and the other parcel was under contract for purchase by Right-Way. The Letter of Intent designated the Debtor as Right-Way's representative, and he signed the same as Right-Way's president. George Kokkinos signed the Letter of Intent on behalf of Beck's. The Debtor did not personally guarantee Right-Way in connection with the Letter of Intent.

The Project ran into several difficulties, including certain abutters' objections to the Project, subdivision appeals with the New Boston Planning Board, and complications in the purchase agreement for the parcel of land Right-Way was to purchase. In addition, Right-Way failed to obtain final subdivision approval by the contracted deadline, and Beck's brought suit against Right-Way in the Hillsborough County Superior Court. On March 26, 2007, Beck's obtained a pre-judgment attachment against the Debtor's real estate located at 99 Tenney Hill Road, Dunbarton, New Hampshire (the "Dunbarton Property"), in the amount of $525,000 in the Superior Court.

On May 22, 2007, the Debtor personally filed for protection under Chapter 13 of the Bankruptcy

---

[1] Unless otherwise indicated, the terms "Bankruptcy Code," "section" and "§" refer to Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8.

Code. On May 30, 2007, this Court approved the Debtor's motion to sell the Dunbarton Property free and clear of liens to a third party. The Court also ordered that if proceeds from the sale remained after certain payments were made, they would be subject to Beck's claim if it was deemed valid and allowed. On September 12, 2007, Beck's filed the Proof of Claim at issue. Subsequently, the Debtor filed his objection to the Proof of Claim.

## DISCUSSION

Broadly speaking, there are two issues before the Court in this matter. First, the Court must determine whether the Debtor satisfies his burden of rebutting the presumption of the Claim's validity. Next, if the presumption is rebutted, the Court must determine whether Beck's presents sufficient evidence to prove the Claim, namely by establishing grounds to pierce Right-Way's corporate veil.

### I. Rebutting Prima Facie Case of a Valid Claim

"A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). To rebut the presumption that attaches to a proof of claim, the objecting party must produce substantial evidence. In re Micro-Precision Tech., Inc., 303 B.R. 238, 243 (Bankr. D.N.H. 2003). "If the objecting party sufficiently rebuts the claimant's prima facie case, the burden shifts back to the claimant as it is ultimately 'for the claimant to prove his claim, not for the objector to disprove it.'" In re Campano, 293 B.R. 281, 285 (Bankr. D.N.H. 2003) (citation omitted).

Beck's filed a proper Proof of Claim. The Debtor in turn produced evidence that: (1) the Debtor formed Right-Way as a corporation; (2) Right-Way is in good standing; (3) Right-Way and Beck's are the parties to the Letter of Intent; and (4) the Debtor did not personally guarantee Right-Way in connection with the Letter of Intent. Accordingly, the Court finds that the Debtor has produced substantial evidence rebutting the presumption of the Claim's validity. Thus, Beck's bears the burden of proving the Claim.

## II.     Piercing the Corporate Veil

Beck's position is that the Claim is valid because there are grounds to pierce Right-Way's corporate veil and find the Debtor personally liable.  Specifically, Beck's argues that the Debtor misled it as to Right-Way's assets and net worth; the Debtor substantially depleted corporate assets, causing Right-Way to operate its business with insufficient assets to meet its liabilities; there was intermingling of property and financial transactions between the Debtor and Right-Way, which benefitted the Debtor personally at the expense of the corporation; and Right-Way failed to observe corporate formalities.  The Debtor argues that there is insufficient evidence for the Court to pierce the corporate veil.  He maintains that the Claim derives from the Letter of Intent and may only be brought against Right-Way.

New Hampshire laws govern the issue of piercing the corporate veil in the instant case.  "[O]ne of the desirable and legitimate attributes of the corporate form of doing business is the limitation of the liability of the owners to the extent of their investment."  Peter R. Previte, Inc. v. McAllister Florist, Inc., 311 A.2d 121, 123 (N.H. 1973).  However, "New Hampshire courts do not 'hesitate[ ] to disregard the fiction of the corporation' when circumstances would lead to an inequitable result."  Terren v. Butler, 597 A.2d 69, 72 (N.H. 1991) (omission in original) (citation omitted).  The standard for piercing the corporate veil in New Hampshire is whether "a shareholder suppresses the fact of incorporation, misleads his creditors as to the corporate assets, or otherwise uses the corporate entity to promote injustice or fraud."  Drudging v. Allen, 451 A.2d 390, 393 (N.H. 1982); see Schlosser v. Garofalo (In re Garofalo), No. 00-13136, Adv. No. 01-1104, 2003 WL 1220261, at *4 (Bankr. D.N.H. Jan. 14, 2003); Gilbert v. Gilbert (In re Gilbert), No. 06-10119, Adv. No. 06-1142, 2007 WL 397018, at *4 (Bankr. D.N.H. Feb.1, 2007).

### A.     Suppressing Corporate Existence and Misleading Creditors as to Corporate Assets

First, the Court notes that the Debtor is not the sole shareholder of Right-Way.  The Debtor testified that his wife owns a forty-nine percent interest in Right-Way and serves as the vice president.

The Debtor's wife was not involved in the proceedings before the Court.

Second, the Court finds that the Debtor did not suppress the corporate existence of Right-Way. The Letter of Intent identifies Right-Way as a corporation and as the party to the agreement. The Letter of Intent designated the Debtor as its representative, and the Debtor signed the agreement as Right-Way's president. Further, bills and written correspondences between the Debtor and Mr. Kokkinos regarding the Project identified Right-Way as the corresponding party. (See Ex. 102.)

Third, the Court does not find that the Debtor misled Beck's about Right-Way's corporate assets and net worth. In New Hampshire, a shareholder may be liable for corporate obligations when he misleads a creditor as to corporate assets and "'creates a false appearance which causes a reasonable creditor to misapprehend the worth of the corporate obligor.'" Peter R. Previte, Inc., 311 A.2d at 124; Drudging, 451 A.2d at 393. Beck's argues that around the time the parties executed the Letter of Intent, the Debtor misled Beck's by representing that a $150,000 note encumbered the Beard Road Property and that Right-Way had a two million dollar line of credit with Lowell Co-Operative Bank. As evidence, Beck's offered the Letter of Intent and Mr. Kokkinos' testimony.[2]

With respect to the mortgage, it is undisputed that the Beard Road Property was in fact encumbered by a $477,920 note at the time the parties executed the Letter of Intent. Mr. Kokkinos testified that based on the Debtor's representations and the Letter of Intent, he believed that the property

---

[2] The relevant provisions of the Letter of Intent are the following:

2. At the present time, Right Way owns a 31 parcel, subject to a $150,000.00 Note, and has a purchase Agreement on an abutting 100 acre parcel, for which a payment of $330,000.00 is due within 30 days of subdivision approval of said 100 acre parcel.
. . . .

8. Right Way presently has a two million dollar line of credit with Lowell Corp. It will assist Beck's in obtaining an additional one million five hundred thousand dollar line of credit to assist with construction costs, if necessary.

was only encumbered by a $150,000 note. However, the mortgage was recorded and available for Beck's to verify. Further, the Debtor testified that the $150,000 figure reflected the expected balance that would be left on the note, after an additional parcel was incorporated into the Project and other parcels were sold. This additional parcel was necessary to make the subdivision work and had a fair market value of approximately $130,000. The Debtor informed Beck's of this parcel and plans to add it to the Project. The Court finds that the $150,000 figure was probably a reasonable estimate of the outstanding mortgage based on the Debtor's calculations and thus, was not a misrepresentation.

Next, contrary to the language in the Letter of Intent, Right-Way did not have the two million dollar line of credit at the time the parties executed the agreement. The Debtor denies that he misrepresented the line of credit. He testified that this representation was based on Right-Way's long-standing relationship with Lowell Co-Operative Bank and discussions he had with a bank representative, who informed him that Right-Way was qualified given its premier builder status. Beck's did not offer evidence to contradict the Debtor's testimony. As such, there is insufficient evidence to determine whether the Debtor misled Beck's about the line of credit, where according to the Debtor's testimony, it was readily available. In sum, the Court finds that Beck's fails to satisfy its burden of proving that the Debtor misled it about Right-Way's assets.

Further, Beck's had no general knowledge of Right-Way's total assets and net worth. Beck's did not inquire into the matter, and the Debtor apprised Beck's only of the Beard Road Property and the line of credit. Thus, Beck's argument that it was misled about Right-Way's net worth also fails.

  **B.**  <u>Use of Corporate Entity to Promote Injustice or Fraud</u>

Since the first two factors set forth in New Hampshire's corporate veil piercing standard are not present in the instant case, to prevail, Beck's must prove that the Debtor used Right-Way to promote an injustice or fraud. Whether under this "injustice or fraud" factor or as other grounds for piercing the corporate veil, courts in New Hampshire have also inquired into whether the shareholder substantially

depleted corporate assets, see Terren, 597 A.2d at 72, and whether the shareholder used the corporation "to further his own private business rather than that of the corporation[,]" see Vill. Press, Inc. v. Stephen Edward Co., Inc., 416 A.2d 1373, 1375 (N.H. 1980). Beck's argues that the Debtor substantially depleted corporate assets, the Debtor intermingled corporate and personal property, and the Debtor used the corporation for personal benefit at the expense of the corporation.

### 1. *Dunbarton Property and Substantial Depletion of Corporate Assets*

Beck's argues that the same year the Project commenced in 2004, the Debtor substantially depleted Right-Way's assets by transferring the Dunbarton Property to himself and his wife and by receiving a salary of $102,900. The New Hampshire Supreme Court has found that a shareholder's substantial depletion of corporate assets, after being advised of defects in a project in which the corporation is involved, provides sufficient basis to find that the corporate entity was used to promote an injustice or fraud. See Terren, 597 A.2d at 72-73 (affirming the trial court's decision to pierce the corporate veil on the grounds that after learning of defects in the condominium units their corporation sold to the plaintiff, the defendant-shareholders depleted corporate assets by paying themselves excessive compensation, receiving repayment on shareholder loans, and receiving stock distributions, leaving the corporation with one sole asset worth $100,000).

First, the Court finds that the Debtor initiated plans to purchase the Dunbarton Property from Right-Way before the parties executed the Letter of Intent and before defects in the Project arose. The Debtor testified and offered evidence to that effect. (See Ex. 13.) In addition, as of August 2005, nearly one year after the Dunbarton Property sale, Beck's expressed continued interest in the Project despite the problems the Project faced. (See Ex. 17.) It is also worth noting that these problems were not of Right-Way's own making, that the Debtor attended over a dozen planning board meetings, and that Right-Way managed to obtain a favorable outcome with respect to certain abutters' objections to the Project.

Second, in view of the record before it, the Court finds that the Debtor did not substantially

deplete Right-Way's assets. The Debtor's salary in 2004 was not unreasonable absent evidence indicating otherwise. In 2004 and at the time of the transfer, the Dunbarton Property's fair market value was approximately $700,000, and the equity in the property was approximately $400,000. (See Ex. 15.) The Debtor and his wife paid $401,339 as consideration for the property, so arguably, approximately $300,000 in corporate funds were depleted. In 2004, Right-Way's total assets amounted to $1,573,209 (see Ex. 2), which included the thirty-one acre Beard Road Property. Its total liabilities did not exceed its assets. Thus, as compared to Right-Way's total assets, the Dunbarton Property transfer and the Debtor's salary did not result in substantial depletion of corporate assets.

Additionally, Beck's argues that in 2004, Right-Way carried on its business without sufficient assets to meet its liabilities. In support, Beck's points out that Right-Way suffered $269,285 in losses in 2004, despite the facts that Beck's paid Right-Way a $275,000 participation fee and $75,000 for Beard Road Property's outstanding mortgage. However, Beck's argument fails because Right-way's tax returns from 2004 through 2006 indicate that Right-Way was adequately capitalized.[3]

Lastly, Beck's seems to suggest that the Debtor's purchase price for the Dunbarton Property evidences fraud or some injustice. It is undisputed that the Debtor and his wife purchased the property for less than fair market value. They paid $401,339, when its fair market value was approximately $700,000. However, the Debtor paid at least the amount Right-Way originally paid for the property. Furthermore, the Debtor accounted for the lower purchase price with his testimony that he did extensive work in building the home on the property without compensation from Right-Way. The Debtor completed all of the work except that which required licensed specialists. The Court finds that the Debtor paid meaningful consideration for the Dunbarton Property, there is no evidence of fraud, and the Debtor did not substantially deplete Right-Way's assets by purchasing the property at a less than fair market value.

---

[3] In 2005, Right-Way's total assets amounted to $1,246,465 and total liabilities were $1,262,465. (Ex. 3.) In 2006, Right-Way's total assets amounted to $1,484,961 and total liabilities were $1,484,961. (Ex. 4.)

### *2. Intermingling of Property and Financial Transactions*

Beck's also argues that there was near complete intermingling of property and financial transactions between the Debtor and Right-Way, which benefitted the Debtor at the expense of Right-Way. The Court agrees that there was considerable intermingling. It is undisputed that Right-Way made payments in excess of $400,000 on the Debtor's personal expenses from corporate accounts during the years 2004 through part of 2007. These payments were documented as "loans to officer" in Right-Way's books and records. The Debtor repaid these loans. (Ex. 107.) Beck's raised an issue regarding the accounting method by which the Debtor repaid such loans, but the method was not adequately explained or challenged during the evidentiary hearings. As such, the Court does not question Right-Way's books and records and the information contained therein, including the repayment history.

In the instant case, evidence of the intermingling itself is insufficient grounds to pierce the corporate veil. There must also be evidence of fraud or injustice. See Vill. Press, 416 A.2d at 1375 ("In order to avail itself of the benefits of the alter ego doctrine, thereby piercing the corporate veil, the plaintiff must establish that the corporate entity was used to promote an injustice or fraud."). Here, such evidence is lacking.

Beck's correctly points out that Right-Way made payments on the Debtor's personal expenses that were undocumented as loans from 2004 to 2007. These payments remain unpaid and include certain attorney fees, expenses from his wife's grooming business, fees totaling $22,200 for the construction of a pool and landscaping at the Debtor's residence, personal tax liabilities, several monthly payments on the Debtor's personal home equity line of credit, and insurance payments on the Debtor's personal Ford F-150 truck. With respect to the insurance payments, the Court concludes that they were corporate expenses because the truck was used as advertising space for Right-Way. With regard to the remaining payments, the Debtor testified that they were inadvertently left out of the books and records. The Court finds his testimony credible. Right-Way's bookkeeper, who also managed the Debtor's personal

finances, testified that there was a systematic loan and repayment arrangement between the Debtor and the corporation. The is no evidence that these omissions were fraudulent, and the Court does not find it unreasonable that certain payments could be overlooked during a span of three to four years, given the accounting procedures between the Debtor and Right-Way.

      Next, it is undisputed that Beck's made several payments to Right-Way based on invoices submitted by the latter that were unrelated to the Project, including the Debtor's personal expenses. The Debtor conceded this fact, but testified that such invoices were sent unintentionally and that Beck's was credited for any improper payment. The Debtor produced evidence of such credits. Beck's, however, did not produce evidence of owed credits that were not given by Right-Way. As such, the Court concludes that these invoices do not evidence fraud.

      Finally, Beck's argues that the Debtor promoted his own business over that of Right-Way. In support, Beck's points to one rental income in the amount of $1,500 from Right-Way's farmhouse that the Debtor deposited into his personal account, a $7,500 payment the Debtor received in connection with the sale of certain real estate, and the Dunbarton Property sale to the Debtor in 2004. In New Hampshire, a plaintiff may establish that a shareholder used the corporate entity to promote an injustice or fraud by producing evidence that the Debtor promoted his own private business rather than that of the corporation. Vill. Press, 416 A.2d at 1375; In re Gilbert, 2007 WL 397018, at *4.

      However, with respect to the Dunbarton Property, the Debtor and his wife purchased the property to use as their residence. They resided there for over two and half years and sold the property as part of the Debtor's Chapter 13 plan, not as part of some personal business plan. Next, Right-Way was not involved in the $7,500 real estate sale. It was a transaction the Debtor undertook independently. The Debtor testified that the $5,000 deposit Right-Way made on a purchase and sale agreement related to a different real estate transaction. Beck's challenged this allegation but did not provide persuasive evidence. As such, the Court finds that the one rental income from the farmhouse that the Debtor

deposited into his personal account is insufficient evidence that the Debtor promoted his personal business over that of Right-Way.

In sum, based on the evidence before it, the Court does not find that the Debtor used Right-Way in a manner that promoted injustice or fraud that justifies piercing the corporate veil.  As such, Right-Way's failure to observe certain corporate formalities is not material here.  See Drudging, 451 A.2d at 394 (providing that for purposes of piercing the corporate veil, there must be evidence that "the lack of formalities was intended to promote injustice or fraud with respect to the plaintiffs").

## CONCLUSION

The factors required for piercing the corporate veil are not present in the instant case.  Thus, Beck's has failed to satisfy its burden of proving the Claim's validity.  For the reasons set out herein, the Court sustains the Debtor's objection to Beck's Proof of Claim, and Claim No. 11 is disallowed.  This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate final order consistent with this opinion.

DATED this 16th day of June, 2008, at Manchester, New Hampshire.

/s/ Mark W. Vaughn
Mark W. Vaughn
Chief Judge